UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
JEFFREY STRUGGS,                           :
                                           :
                        Plaintiff,         :          **REPORT AND**
                                           :          **RECOMMENDATION**
              -against-                    :
                                           :          22-CV-6 (DG)(PK)
KIA MOTORS FINANCE; EQUIFAX                 :
INFORMATION SERVICES, LLC; EXPERIAN         :
INFORMATION SOLUTIONS, INC.; and           :
TRANS UNION LLC,                           :
                                           :
                        Defendants.        :
------------------------------------------------------------- X

**Peggy Kuo, United States Magistrate Judge:**

Jeffrey Struggs ("Plaintiff") brought this action against Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), Trans Union LLC ("Trans Union") (collectively, "Credit Bureaus"), and Kia Motors Finance ("Kia") (with the Credit Bureaus, "Defendants"), alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681e(b), 1681i(a)(1, 4-5), and 1681s(2)(b), and the New York Fair Credit Reporting Act ("NYFCRA"), N.Y. Gen. Bus. Law §§ 380-f(a-b) and 380-j(a).  ("Compl.," Dkt. 1.)  After settlement discussions, Defendants have each moved to enforce their separate settlements with Plaintiff, and Trans Union and Kia also seek attorneys' fees incurred in enforcing their settlements.  ("Experian Motion," Dkt. 71; "Equifax Motion," Dkt. 78; "Trans Union Motion," Dkt. 81; "Kia Motion," Dkt. 96[1] (collectively, "Motions").)

The Honorable Diane Gujarati has referred the Motions to me for a Report and Recommendation.  (Order dated March 15, 2023.)  For the reasons stated herein, I respectfully

---

[1] The Court partially granted Kia's motion for leave to file under seal its motion for settlement enforcement, allowing Kia to file its motion with two terms of the purported settlement agreement redacted.  (Docket Order dated Aug. 25, 2023.)

recommend that Defendants' motions for settlement enforcement be granted, and that Trans Union and Kia's motions for attorneys' fees be denied.

## FACTUAL BACKGROUND

In September 2012, Plaintiff financed a vehicle with Kia (the "Kia Account"). (Compl. ¶ 9.) Plaintiff alleges that although he made the final payment on the Kia Account on August 23, 2018, Kia reported that Plaintiff was delinquent on his payment and later that it charged off Plaintiff's remaining debt on the Kia Account. (*Id.* ¶¶ 10-11.) The Credit Bureaus included this information about Plaintiff's delinquency and the charged-off Kia debt on his credit file published to third parties. *(Id.* ¶ 12.) Plaintiff alleges that, as a result, this inaccurate information gave creditors and potential creditors the false impression that he was a poor credit risk and caused him to suffer substantial emotional distress. (*Id.* ¶ 12.) Plaintiff notified the Credit Bureaus about the inaccuracies relating to the Kia Account, but they continued to report and publish that information. (*Id.* ¶¶ 20-34.)

On January 3, 2022, Plaintiff filed the Complaint. (Compl.) Plaintiff was represented at the time by Brett Sherman, Esq. ("Sherman") and James Ticchio, Esq. ("Ticchio," together with Sherman, "Counsel" or "Plaintiff's Counsel"). (*See* Compl. at 1, 11; Notice of Appearance by James Ticchio, Dkt. 11.)

### I.        Settlement Negotiations

On May 5, 2022, Plaintiff's Counsel emailed Plaintiff asking for confirmation that Plaintiff authorized Counsel to settle on the following terms:

> 1. The Kia account remains on your reports, shows no late payments after July 2018, and shows that the account has been paid in full
> 2. While you agree to a release of all Fair Credit Reporting Act claims, you do not release your claims under any laws other than the Fair Credit Reporting Act
> 3. Neither Equifax, Experian, nor Trans Union are required to pay you any money.

(Ex. A to Pl. Opp. to Experian Mot.[2] at 3 (ECF pagination), Dkt. 74-1.)

---

[2] Plaintiff's Opposition to Experian's Motion (Dkt. 74) is hereinafter referred to as "Opp. to Experian."

Later that day, Plaintiff emailed Ticchio, stating, "Yes James you have authority to seek settlement with Transunion, Equifax and Experian only." (Ex. A to Opp. to Experian at 2 (ECF pagination).)

On May 6, 2022, the parties jointly requested a settlement conference, which the Court scheduled for July 7, 2022. (Mot. for Settlement Conference at 1, Dkt. 34; Docket Order dated May 9, 2022.)

Thereafter, Plaintiff engaged in settlement discussions with each Defendant separately, as described below. These facts are taken from various emails and other documents submitted by Plaintiff, Plaintiff's Counsel, and each of the Defendants. Although the parties do not appear to have submitted every email exchanged during settlement discussion, those that were submitted are sufficient to allow the Court to determine the relevant facts without the need for an evidentiary hearing. *See In re Artha Mgmt., Inc.*, 91 F.3d 326, 330 (2d Cir. 1996) (noting that "a hearing is not necessary").

## A. Experian

On May 9, 2022, Sherman conveyed Plaintiff's settlement demand to Experian's counsel, Brett M. Weinstein, Esq., by email as follows:

Plaintiff is willing to settle on the following terms:

> • The disputed Kia account remains on Plaintiff's credit file, but shows no late payments after July 2018 (there were none), and shows that the account has now been paid in full (which it has). In other words, we are merely asking Experian to report accurately.

> • Mutual confidentiality.

> • Experian pays nothing.

> • Plaintiff releases all Fair Credit Reporting Act (FCRA) claims, but he does not release his claims other than those he could have brought pursuant to the FCRA.

(Weinstein Decl. ¶ 6; Ex. 3 to Weinstein Decl. at 9, Dkt. 72-3.)  Experian's counsel asked Sherman for clarification as to the fourth demand, and Sherman responded, "The intent would be to waive NY FCRA claims as well . . . I will get back to you with official confirmation about the NY FCRA claims as soon as I have that specific authority from my client."  (Weinstein Decl. ¶ 7-8; Ex. 3 to Weinstein Decl. at 8.)

That same day, Experian's counsel spoke to Sherman via telephone and informed him that the Kia Account was no longer reporting on Plaintiff's credit file due to its age.  (Weinstein Decl. ¶ 9.)  After Sherman relayed this information to his client, Plaintiff emailed Sherman on May 10, 2022, asking if he could obtain a written explanation from Experian as to why the Kia Account was "suddenly removed" from his credit file and when.  (Ex. C to Opp. to Experian at 2 (ECF pagination), Dkt. 74-3.)

On June 9, 2022, Sherman emailed Plaintiff stating, "I believe we have settlements in principle with all except, of course, Kia. I am just working on the language with Experian."  (Ex. E to Opp. to Experian at 3 (ECF pagination), Dkt. 74-5.)

On June 21, 2022, Sherman emailed Experian's counsel, "It is the proposed limited release language that I will send to you today. If it is acceptable, we can wrap up per the other agreed-to terms."  (Weinstein Decl. ¶ 12, Ex. 3 to Weinstein Decl. at 14.)  Sherman then forwarded Experian's counsel the proposed limited release containing "language releasing Experian for Fair Credit Reporting Act claims and New York Fair Credit Report Act claims."  (Weinstein Decl. ¶¶ 12-13.)  Experian's counsel made "a couple of proposed changes" and asked for confirmation from Sherman that the fact that the Kia Account was no longer recording would "not be an impediment to settlement."  (Weinstein Decl. ¶ 14; Ex. 3 to Weinstein Decl. at 2.)  Sherman responded, "Good by me."  (Weinstein Decl. ¶ 16; Ex. 3 to Weinstein Decl. at 1.)

On June 29, 2022, Sherman left Experian's counsel a voicemail requesting Experian's consent to file a motion to adjourn the July 7 settlement conference *sine die* and stating, "I think we're gonna be able to get this fully resolved once we work out the language without the need for the [sic] spending the time or money on, on going to court or having a court call or whatever it is." (Weinstein Decl. ¶ 18.) Experian's counsel consented to Sherman filing the motion to adjourn the settlement conference. (Weinstein Decl. ¶ 19.)

Later that day, the parties moved to adjourn the settlement conference, noting that Plaintiff had reached settlements in principle with Equifax and Trans Union, and was optimistic that he would settle with Kia and Experian soon without the Court's assistance. (Dkt. 39.) The next day, the Court granted the motion and cancelled the settlement conference. (Docket Order dated June 30, 2022.)

On July 1, 2022, Experian's counsel emailed Sherman a copy of the proposed settlement agreement with one change, stating, "If the additional language is fine, can you please file a notice of settlement/request for extension of time to file a stip, and I will start working on the settlement agreement?" (Weinstein Decl. ¶ 20; Ex. 3 to Weinstein Decl. at 1.) Sherman responded, "Yes, Brett. Thanks. Please send over a final agreement." (Weinstein Decl. ¶ 22; Ex. 4 to Weinstein Decl. at 11, Dkt. 72-4.)

On July 6, 2022, Sherman filed a motion for leave to file a stipulation of dismissal, noting that Plaintiff and Experian "reached a confidential settlement in principle of Plaintiff's claims against Experian." (Mot. to File Stipulation with Experian, Dkt. 41.) On July 7, 2022, the Court granted the motion and set a deadline of August 18, 2022 to file the stipulation of dismissal. (Docket Order dated July 7, 2022.) Subsequently, all discovery and substantive litigation between the parties ceased. (Weinstein Decl. ¶ 24.)

On July 25, 2022, Experian's counsel sent Plaintiff's Counsel the settlement agreement (Ex. 1 to Weinstein Decl. ("Experian Settlement Agreement"), Dkt. 72-1) for Plaintiff's review and signature.

(Weinstein Decl. ¶¶ 26-27.)  This agreement contained the agreed-to limited release language and noted that Experian would not report the Kia Account.  (Weinstein Decl. ¶ 28.)  Sherman sent the settlement agreement to Plaintiff, explained that Experian was no longer reporting the Kia Account, and stated, "[i]f there is a problem with the credit report, do not sign the agreement."  (Ex. F to Opp. to Experian at 2 (ECF pagination), Dkt. 74-6.)

On August 2, 2022, Plaintiff emailed Sherman stating that if "Experian [does] not report" the Kia Account it would "prevent [him] from getting credit for paying off the vehicle."  (Ex. J to Opp. to Experian at 3 (ECF pagination), Dkt. 74-10.)  Sherman replied to Plaintiff, stating, "It is very important that we speak."  (*Id.*)  Although the record does not indicate that they spoke, in response to Experian's counsel's request that Plaintiff and his counsel draft a stipulation of dismissal for his review (Weinstein Decl. ¶ 31; Ex. 4 to Weinstein Decl. at 3), Sherman requested consent on August 18, 2022 to extend that deadline because a member of Plaintiff's family had passed away.  (Weinstein Decl. ¶ 31; Ex. 4 to Weinstein Decl. at 3.)

### B. Equifax

On May 13, 2022, Ticchio emailed Plaintiff informing him that "Equifax has just agreed to settle on the terms we discussed."  (Ex. A to Pl. Opp. to Equifax Mot.[3] at 3 (ECF pagination), Dkt. 79-1.)  Plaintiff responded, "Ok that is great news. Thank You and Brett so much."  (*Id.*)

On June 2, 2022, Sherman filed a Notice of Settlement in Principle.  (Dkt. 35.)  On June 6, 2022, Sherman filed a motion for leave to file a stipulation of dismissal, indicating that Plaintiff and Equifax had "reached a confidential settlement in principle of Plaintiff's claims against Equifax."  (Dkt. 38.)  The Court set a deadline of August 2, 2022 for Plaintiff and Equifax to file a stipulation of dismissal.  (Docket Order dated June 6, 2022.)

---

[3] Plaintiff's Opposition to Equifax's Motion (Dkt. 79) is hereinafter referred to as "Opp. to Equifax."

Following discussions between the parties, on June 21, 2022 Sherman sent a copy of the proposed settlement agreement and Plaintiff's credit report to Plaintiff. (Ex. D to Opp. to Equifax at 5 (ECF pagination), Dkt. 79-4.) As discussed above, the parties then moved to adjourn the settlement conference, noting that Plaintiff had reached a settlement in principle with Equifax, and the Court cancelled the settlement conference.

Plaintiff responded to Sherman on July 1, 2022 stating that he had not been informed if Equifax had "corrected the settlement offer" which had "falsely stated" that Plaintiff "paid the 'charge off' in full," rather than having paid off the entire Kia Account. (Ex. D. to Opp. to Equifax at 5 (ECF pagination).)

On August 3, 2022, counsel for Experian, Adam T. Hill, Esq., emailed Sherman stating that with respect to the Kia Account, Experian was unaware of any code for "account as fully paid," and suggested various alternatives to deal with the tradeline, including removing it completely. (Ex. A to Equifax Reply at 2, Dkt. 80-1.) On August 4, 2022, Sherman replied, "Thanks – please delete the tradeline." (*Id.* at 1.) That same day, Sherman notified Plaintiff that Equifax would not report the Kia Account at all. (Ex. F to Opp. to Equifax at 3, Dkt. 79-6.) Sherman sent a copy of the updated settlement agreement (("Equifax Settlement Agreement"), Dkt. 92-1) to Plaintiff on August 10, 2022, and August 29, 2022. (Ex. E to Opp. to Equifax at 3, Dkt. 79-5.)

### C. Trans Union

On May 9, 2022, Sherman provided counsel for Trans Union, Jared D. Brown, with Plaintiff's settlement demand as follows:

• The disputed Kia account remains on Plaintiff's credit file, but shows no late payments after July 2018 (there were none), and shows that the account has now been paid in full (which it has). In other words, we are merely asking Experian to report accurately.

• Mutual confidentiality.

• Trans Union pays nothing.

• Plaintiff releases all Fair Credit Reporting Act (FCRA) claims, but he does not release his claims other than those he could have brought pursuant to the FCRA.

(Ex. A to Trans Union Mot. at 11-12 (ECF pagination), Dkt. 81-2.)

After a phone call between Sherman and Trans Union's counsel, on May 9, 2022, Sherman emailed him an explanation of Plaintiff's requested release clause, stating that, "as discussed, I must get my client's consent to release the NY FCRA claims prior to formalizing any settlement." (Ex. A to Trans Union Mot. at 10 (ECF pagination).) That same day, Sherman emailed Trans Union's counsel, stating:

> I can now confirm that my client is willing to [sic] a settlement that includes no payment to Trans Union release claims under the FRCA and NY FRCA if the following can be done with respect to Plaintiff's Trans Union credit file: the disputed Kia account remains on Plaintiff's credit file, but shows no late payments after July 2018 (there were none), and shows that the account has now been paid in full (which it has).

(Id.) Trans Union's counsel replied, "Just want to make sure we're on the same page. Will your client agree to a full release of all claims?" (Id. at 9 (ECF pagination).) Sherman responded, "All FCRA and NY FCRA claims but not a broad general release. In exchange for dismissal and no payment." (Id. at 8.) Trans Union's counsel replied, "What other claims does your client have th[at] aren't already identified? Will dismissal be with prejudice?" (Id.) Sherman responded, "Dismissal will be with prejudice and my client will be waiving any claims under the FCRA or NYFCRA. Aside from FCRA and NYFCRA claims I do not know of any particular claims. I know that my client authorized a settlement for $0 in exchange for the releases described above with the tradeline updates stated earlier on this email chain." (Id. at 7-8 (ECF pagination).)

On May 11, 2022, Trans Union's counsel emailed Sherman, stating, "I can confirm settlement. To recap, Plaintiff agrees to dismiss with prejudice in exchange for the previously mentioned tradeline maintenance (removing late payments) and release of FCRA and NY FCRA claims only." (Ex. A to Trans Union Mot. at 6 (ECF pagination).) The following day, Sherman emailed Plaintiff, "Great news!

Trans Union has agreed to your settlement terms. We will now seek settlement with Experian on the same terms (except, as we discussed, the account will not reappear on your Experian report.)." (Ex. B to Pl. Opp. to Trans Union Mot.[4] at 2 (ECF pagination), Dkt. 82-2.) Plaintiff responded, "Ok thank you." (*Id.*)

On June 2 and June 6, 2022, respectively, Sherman filed a Notice of Settlement in Principle (Dkt. 36) and a motion for leave to file a stipulation of dismissal, indicating that Plaintiff and Trans Union "reached a confidential settlement in principle of Plaintiff's claims." (Dkt. 37.) The Court set a deadline of August 2, 2022 for Plaintiff and Trans Union to file a stipulation of dismissal. (Docket Order dated June 6, 2022.) The parties then moved to adjourn the settlement conference, noting that Plaintiff had reached a settlement in principle with Trans Union, and the Court cancelled the conference. (Docket Order dated June 30, 2022.)

After multiple conversations about editing details of the settlement agreement (*see* Ex. B to Trans Union Mot. at 2-7 (ECF pagination), Dkt. 81-3), on August 3, 2022, Sherman emailed Trans Union's counsel notifying him of an error: although the "agreement was that there would be no indication of any late payment after July 2018," the Kia Account still indicated that Plaintiff was 60 days late on a payment due in January 2022. (Ex. A to Trans Union Mot. at 4.) On August 10, 2022, Trans Union's counsel replied to Sherman stating that he had requested that the Kia Account "tradeline be suppressed from [Plaintiff's] Trans Union credit file." (*Id.* at 3.) In response, Sherman stated, "[t]hank you for the update." (*Id.* at 2-3.) The next day, Trans Union's counsel sent an updated copy of the settlement agreement (Ex. E to Trans Union Mot. ("Trans Union Settlement Agreement"), Dkt. 81-6) with Plaintiff's credit file reflecting that the Kia Account had been deleted. (Ex. A to Trans Union Mot. at 2.) Sherman replied, "Thanks, Jared." (*Id.*)

---

[4] Plaintiff's Opposition to Trans Union's Motion (Dkt. 82) is hereinafter referred to as "Opp. to Trans Union."

### D. *Kia*

On June 20, 2022, Plaintiff's Counsel emailed Plaintiff, stating,

Thank you for taking the time to speak with me today. Please confirm that you have authorized us to offer a settlement to Kia on the following terms:

1. The Kia account remains on your reports, shows no late payments after July 2018, and shows that the account has been paid in full
2. While you agree to a release of all Fair Credit Reporting Act claims, you do not release your claims under any laws other than the Fair Credit Reporting Act
3. Kia is not required to pay you any money.

Once you confirm this authority, I will bring it to Kia and see if we can reach a quick resolution.

(Ex. B to Pl. Opp. to Kia Mot.[5] at 2 (ECF pagination), Dkt. 86-2.)

On June 29, 2024, the parties moved to adjourn the settlement conference, noting they were optimistic that Plaintiff would settle with Kia, and the Court granted the motion and cancelled the settlement conference.  (Docket Order dated June 30, 2022.)

Following settlement discussions, on July 6, 2022, Ticchio emailed counsel for Kia, Jonathan M. Marmo, Esq., stating,

Thank you for your recent Offer. We accept. To be clear, these are the terms we have agreed to:

1.  The Kia account remains on my client's reports, showing no late payments after July 2018, and showing that the account has been paid in full
2.  Mutual confidentiality
3.  Plaintiff releases all FCRA claims (not non-FCRA claims)
4.  [REDACTED]
5.  [REDACTED][6]

Thank you Jonathan. I will prepare a notice of settlement for your review.

(Ex. A to Kia Mot. at 16 (ECF pagination).)  On July 7, 2022, Ticchio filed a motion for leave to file a stipulation of dismissal, indicating that Plaintiff and Kia had "reached a confidential settlement in

---

[5] Plaintiff's Opposition to Kia's Motion (Dkt. 86) is hereinafter referred to as "Opp. to Kia."
[6] As a term of the parties' agreement, Kia was to pay Plaintiff an amount of money.

principle of Plaintiff's claims against Kia." (Dkt. 42.) The Court granted the motion and set a deadline of August 19, 2022 for Plaintiff and Kia to file a stipulation of dismissal. (Docket Order dated July 7, 2022.)

The next day, Plaintiff emailed Ticchio, stating "I pray that KIA is stating 'paid in full' for the entire loan payment of the vehicle and not the fictitious 'charge off' like Equifax was trying to get me to sign." (Ex. E to Opp. to Kia at 4 (ECF pagination), Dkt. 86-5.) Ticchio replied, noting that that was "what Kia agreed to," but he would "keep an eye on the terms of the settlement agreement." (*Id.* at 5 (ECF pagination).)

After further negotiations between Plaintiff and Kia, on August 10, 2022 Sherman emailed Kia's counsel a redlined copy of the settlement agreement. (Ex. C to Kia Mot. at 20 (ECF pagination).) Kia's counsel responded that he would confirm that the draft was agreeable with Kia's in-house counsel. (*Id.*) On August 18, 2022, Kia's counsel emailed Sherman that Kia had "no objection to the edits to the release and the tax notification section." (Ex. D to Kia Mot. at 24 (ECF pagination).) However, because Hyundai had problems with requests for specific tradeline edits, Kia's counsel asked if Plaintiff would consider a complete tradeline deletion ("TLD"), which Kia's counsel noted may be more beneficial due to late payments throughout the life of the Kia Account. (*Id.*) Kia's counsel then stated, "[i]f that works, we will finalize the agreement today." (*Id.*) Sherman responded, "Yes, TLD works. Kindly send me a final agreement," and Kia's counsel sent the revised agreement (Ex E. to Kia Mot. ("Kia Settlement Agreement") at 26-32 (ECF pagination)) to Sherman and Ticchio. (*Id.* at 23.)

## II.    Further Events

On August 22, 2022, Sherman filed a letter with the consent of all Defendants, requesting an extension of time to file the stipulations of dismissal as to all Defendants to September 5, 2022. (Weinstein Decl. ¶ 33; Dkt. 45.) The Court granted the request. (Order dated August 22, 2022.)

In an email to Counsel on September 1, 2022, Plaintiff claimed, "We have gone back and forth for well over six months and none of my requests have been honored." He further stated:

1. I am requesting that Kia Motor Finance specifically states in the settlement agreement that I paid my vehicle off in full and it is wholly satisfied.
2. Either they report the account as paid in full or wholly satisfied to the three credit bureaus OR they completely remove the account from all three credit bureaus and agree that this account will not show up by any vendor, under any code whatsoever.

(Dkt. 91 (emphasis in original).)

Ticchio responded, stating that the "Kia account has, to my understanding, already been deleted by each credit bureau." (Ex. J to Opp. to Kia at 2 (ECF pagination), Dkt. 86-10.)

Plaintiff replied, stating that he "never authorized any of the terms presented to me in any of the settlement agreements," and that if Ticchio and Sherman had agreed to settlements in principle with the Defendants, they would "have a big problem on [their] hands." (*See, e.g.*, Ex. K to Kia Opp. at 2 (ECF pagination), Dkt. 86-11.)

Over the next 11 days, Ticchio and Sherman submitted documents under seal to the Court (Dkts. 47, 50) and, on September 12, 2022, moved to withdraw as Plaintiff's attorney. (Dkt. 52.) On September 23, 2022, Plaintiff filed a motion requesting that the Court appoint him counsel and a letter accusing Sherman and Ticchio of "making false and misleading statements to [him] regarding settlement offers" and stating his intent to "file complaints against them for their wrong doings." (Dkts. 53, 54 at 2 (ECF pagination).) On October 3, 2022, the Court granted Ticchio and Sherman's motion to withdraw as counsel and denied, without prejudice, Plaintiff's request to be appointed pro bono counsel. (Mem. and Order dated October 3, 2022, Dkt. 56.) Since then, Plaintiff has proceeded *pro se*.

Plaintiff did not file any stipulations of dismissal by the deadline. Defendants thereafter filed the Motions to enforce the settlements.

## DISCUSSION

I.    **Settlement Enforcement**

The Court considers the enforceability of the settlement agreements and whether Plaintiff's Counsel had authority to enter into those settlements on Plaintiff's behalf.

### A.  *Enforceability of Settlement Agreements*

#### 1.  **Choice of Law**

Although the Second Circuit has not resolved the question of whether a district court should apply federal or state law to decide a motion to enforce a settlement, it has found that there is "no material difference" between New York law and federal common law on this issue.  *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997).  "The majority of district courts have applied only federal common law in federal question cases" assessing a motion to enforce settlement.  *Est. of Brannon v. City of N.Y.*, No. 14-CV-2849 (AJN)(SN), 2015 WL 13746664, at *4 (S.D.N.Y. Oct. 19, 2015).  Because the Court of Appeals has not definitively ruled on the issue, I will consider the enforceability of the settlements under both federal common law and New York law.

#### 2.  **Federal Common Law**

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it."  *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974).  Although a court should "avoid trapping parties in surprise contractual obligations . . . it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation."  *Murphy v. Institute of Int'l Educ.*, 32 F.4th 146, 151 (2d Cir. 2022) (internal quotation marks and citation omitted).

The Second Circuit applies the four-factor test outlined in *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) to determine "whether the parties intended to be bound to an oral or unsigned settlement agreement."  *Aberra v. City of New York*, No. 18-CV-1138 (LAK)(SLC), 2020 WL

11772386, at *5 (S.D.N.Y. July 31, 2020) (citing *Winston*, 777 F.2d at 80).  The *Winston* factors are "(1) whether there has been express reservation of the right not to be bound in the absence of a writing; (2) whether there has been a partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing."  777 F.2d at 80.  "This test is meant to discern intent, since in any given case it is the intent of the parties that will determine the time of contract formation."  *Xie v. Caruso, Spillane, Leighton, Contrastano, Savino & Mollar, P.C.*, 632 F. Supp. 3d 262, 267 (S.D.N.Y. Sept. 29, 2022) (cleaned up).  "[N]o single factor is decisive, but each provides significant guidance."  *Walker v. City of N.Y.*, No. 05-CV-4 (JBW)(JMA), 2006 WL 1662702, at *7 (E.D.N.Y. June 15, 2006) (citations omitted).  "[T]he proponent of a contract has the burden of proving the existence of a binding contract by a preponderance of the evidence."  *Xie*, 632 F. Supp. 3d at 267 (citing *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)).

### a.   *Reservation of the Right Not to be Bound*

The first and "most important" *Winston* factor considers whether there has been an express reservation of the right not to be bound in the absence of a writing.  *HVN Clothing, Inc. v. Lomeway E-Commerce (Luxembourg) Ltd.*, 636 F. Supp. 3d 451, 456 (S.D.N.Y. Oct. 21, 2022).  The first factor has "the power to tip the scale slightly more than the other three."  *Geneva Laboratories Ltd. v. Nike West African Imp. and Exp., Inc.*, No. 19-CV-4419 (EK)(RER), 2021 WL 7287611, at *5 (E.D.N.Y. Aug. 16, 2021) (citing *U.S. v. U.S. Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars ($660,200.00), More or Less*, 423 F. Supp. 2d 14, 26 (E.D.N.Y. 2006)).  "The first factor is satisfied when there has been no express reservation, and when the circumstances and actions of the parties indicate no reservation, of the right not to be bound absent a written agreement."  *Id.* (citing *Conway v. Brooklyn Union Gas Co.*, 236 F. Supp. 2d 241, 249 (E.D.N.Y. Nov. 7, 2002)).

Here, neither Plaintiff nor any Defendant reserved the right not to be bound in the absence of a signed writing.  Rather, in multiple email exchanges between counsel for Defendants and Plaintiff's Counsel, discussing and then agreeing to terms of the settlements, there was no express reservation of the right not to be bound.  (Ex. A to Trans Union Mot. at 6-12 (ECF pagination) (back and forth correspondence over two days culminating in Trans Union listing terms of agreement and stating, "I can confirm settlement"); Exs. 3, 4 to Weinstein Decl. (Experian and Plaintiff's Counsel discussing, modifying and agreeing to terms of settlement over the course of approximately three months); Ex. A to Equifax Reply at 1-3 (parties agreeing to deletion of the Kia Account on Plaintiff's credit report); Exs. C, D to Kia Mot. at 20-21, 23-24 (ECF pagination) (Plaintiff's Counsel listing terms of agreement, stating, "Thank you for your recent offer. We accept," and further negotiating settlement terms).)

That these exchanges were documented in writing via email bolsters their power to bind the parties. *See Est. of Brannon*, 2015 WL 13746664, at *5 ("The fact that the exchange occurred by email does not weaken the enforceability of the agreement.  Indeed, if anything, the fact that the exchange was written strengthens its power to bind").  These "email exchanges would have been appropriate opportunities to state an intent not to be bound," yet the parties "did not expressly state any such intention." *Geneva Laboratories*, 2021 WL 7287611, at *5.  Plaintiff's Counsel's email communications with Trans Union and Kia are even more detailed, and "constitute a classic offer and acceptance, contain all the terms of the agreement, and evidence the intent that the parties had a deal." *Suarez v. Gakk Rest. Inc.*, No. 20-CV-1464 (BMC), 2021 WL 4123055, at *2 (E.D.N.Y. Sept. 9, 2021) (cleaned up).

To the extent that courts may "also look at the language in the settlement documents as evidence of the parties' intent to be bound," *Geneva Laboratories*, 2021 WL 7287611, at *5, the language in the settlement agreements does not demonstrate a reservation of the right not to be bound absent

a signed agreement. Some courts have found the inclusion of certain merger and introductory clauses to be evidence of a reservation of the right not to be bound. *See, e.g.*, *Aberra*, 2020 WL 11772386, at *12. However, the merger clause in the settlement agreements state only that the agreements "may not be modified or amended except in a writing signed by the Parties," not that they are not effective until signed. (Kia Settlement Agreement at 1, ¶ 6; *see also* Experian Settlement Agreement at 1, ¶ 9; Trans Union Settlement Agreement at 1, ¶ 12; Equifax Settlement Agreement at 2, ¶ 9.) Such language, without a specific provision stating that the agreement is not binding until executed, does not indicate an express reservation of the right not to be bound in the absence of a signed writing. *See Geneva Laboratories*, 2021 WL 7287611, at *6 ("Boilerplate language in the draft settlement agreement stating that the parties are bound by their signature is not equivalent to an express provision stating that the agreement is not binding until executed"); *Conway*, 236 F. Supp. 2d at 249 n.8 (the merger "clause in *Ciaramella* was specific in stating that the parties did not intend the agreement to become effective until it was signed. The clause here says no such thing"). Absent an express and specific intent to be bound only by signature, the court will not imply such a reservation. *See Chang v. CK Tours, Inc.*, 605 F. Supp. 3d 529, 539 (S.D.N.Y. 2022) ("the first *Winston* factor does not ask whether the parties *implicitly* reserved their right not to be bound. It asks whether they *expressly* did so") (emphasis in original).

Accordingly, the first *Winston* factor weighs in favor of enforcing the settlements as to all Defendants.

### b. Partial Performance

The second factor considers "whether one party has partially performed, and that performance has been accepted by the party disclaiming the existence of an agreement." *Ciaramella*, 131 F.3d at 325. "Courts considers acts such as payment . . . or carrying out other terms of settlement as evidence of partial performance." *Geneva Laboratories*, 2021 WL 7287611, at *6.

16

The Credit Bureaus partially performed their obligations under the settlements. Upon each Credit Bureau confirming with Plaintiff's counsel that Plaintiff was amenable to a trade line deletion of the Kia Account, the Credit Bureaus each deleted the Kia Account from their respective records. (*See* Trans Union Settlement Agreement ¶ 5; Ex. A to Trans Union Settlement Agreement at 1-3; Experian Settlement Agreement ¶ 5; Ex. A to Experian Settlement Agreement at 1-8; Opp. to Equifax ¶ 3).

In addition, after filing the notices of settlement with the Court, the Credit Bureaus ceased litigation activities. This bolsters the Credit Bureaus' position regarding the second *Winston* factor, as "[w]hen both parties stop actively litigating the case based on the apparent settlement, courts may construe this as partial performance." *Geneva Laboratories*, 2021 WL 7287611, at *6 (collecting cases).

Kia also stopped litigating. However, cessation of litigation activities alone does not constitute partial performance, as "absent evidence of partial performance of any of the terms of the Settlement Agreement, the mere fact that the parties have refrained from further litigation does not weigh for or against [a party's] claim that the Settlement Agreement is binding." *Sprint Comms. Co. L.P. v. Jasco Trading, Inc.*, 5 F. Supp. 3d 323, 336 (E.D.N.Y. Mar. 25, 2014). Kia has presented no affirmative evidence or even stated that it performed any of its obligations under the settlement. The mere fact that "Plaintiff admits the Kia tradeline has been removed" from his credit reports (Kia Reply at 3, Dkt. 87) does not indicate that it was Kia who affirmatively performed a term of the settlement agreement by removing it. It was apparently possible for the Credit Bureaus to delete the tradeline without Kia first taking action. (*See* Trans Union Mem. of Law at 2 n.1, Dkt. 81-1 (noting that Trans Union, on its own accord, deleted the Kia Account from Plaintiff's credit report after it encountered issues based on Kia's continued reporting of the Kia Account).)

This factor, therefore, weighs in favor of enforcing the settlements as to the Credit Bureaus but is neutral as to Kia.

### c.  Material Terms

The third factor of the *Winston* test examines "whether all of the terms of the alleged contract have been agreed upon."  777 F.2d at 80.  "The Second Circuit has clarified that the third *Winston* factor should evaluate whether the parties have agreed 'on all material terms.'"  *Est. of Brannon*, 2015 WL 13746664, at *3 (citing *Ciaramella*, 131 F.3d at 325).  "Courts in this Circuit have found that this factor favors enforcement even when the parties are still negotiating certain terms."  *Geneva Laboratories*, 2021 WL 7287611, at *7 (collecting cases).

"Here, the emails contain the material terms of the settlement[s]."  *Suarez*, 2021 WL 4123055, at *3.  With respect to Trans Union, Experian, and Kia, the parties set forth in emails the specific terms of their settlement agreements and noted confirmation of settlement.  (Ex. A to Trans Union Mot. at 6 (ECF pagination); Kia Mot. at 21 (ECF pagination); Ex. 3 to Weinstein Decl. at 1-9.)  Subsequently, the parties changed a term—that the Kia Account be deleted from Plaintiff's credit files rather than shown as paid in full—discussion of which is well documented in emails.  (Ex. D to Kia Motion at 23-24 (ECF pagination); Ex. 3 to Weinstein Decl. at 1-2; Ex. A to Trans Union Motion at 3-4 (ECF pagination).)  In addition, changes to broaden the scope of the release from solely FCRA claims to both FCRA and NYFCRA claims are memorialized in emails.  (Weinstein Decl. ¶¶ 12-13; Ex. 3 to Weinstein Decl. at 1-3; Ex. A to Trans Union Mot. at 6 (ECF pagination); Ex. N to Opp. to Kia at 2 (ECF pagination).)  The written settlement agreements reflect these same terms, agreed to and modified over email, leaving no doubt that the parties agreed to the material terms of the settlement agreement.  (*See* Experian Settlement Agreement; Trans Union Settlement Agreement; Kia Settlement Agreement.)

Only Equifax has not submitted email correspondence with Plaintiff's Counsel detailing all the material terms of the settlement.  However, Plaintiff submitted his correspondence with his lawyers in which Plaintiff's Counsel first set forth the settlement terms they understood Plaintiff

authorized them to offer to Equifax (Ex. B to Opp. to Equifax at 4 (ECF pagination)), and then subsequently stated, "Equifax has just agreed to settle on the terms we discussed" (Ex. A to Opp. to Equifax at 3 (ECF pagination)).  As Equifax points out, Plaintiff agrees that these were the "essential terms" of the settlement.  (*See* Opp. to Equifax at 2 (ECF pagination) (stating that "Equifax Information services did enter into a settlement in principle[] [w]ith Plaintiff Jeffrey Struggs," and noting that, "In exhibit B [(Dkt. 79-2)] the Plaintiff's terms of settlement are listed"); Equifax Reply at 2, Dkt. 80 ("Equifax and Plaintiff, through his former attorneys, reached a final agreement regarding the essential terms of a settlement, which Plaintiff admits").)

Plaintiff and Equifax subsequently modified these material terms in two respects.  First, they agreed that Equifax would delete the Kia Account from Plaintiff's credit report rather than show it as paid in full.  This change is apparent from email correspondence between Plaintiff's Counsel and counsel for Equifax.  (Ex. A to Equifax Reply at 1.)  In addition, the release was modified to include both FCRA and NYFCRA claims.  Plaintiff appears to acknowledge this change by arguing that as a result of "the defendant rejecting the plaintiff['s] terms of settlement[] [t]he offer of plaintiff waiving FCRA, NY FCRA are no longer valid."  (*See* Opp. to Equifax at 3 (ECF pagination).)  The release of both FCRA and NYFCRA claims, along with the deletion of the Kia Account and the other agreed upon material terms, are reflected in the written settlement agreement.  (*See* Equifax Settlement Agreement.)  Thus, it is apparent that Plaintiff and Equifax had agreed to the material terms of the settlement.

Accordingly, this factor weighs in favor of enforcing the settlements as to all Defendants.

### d.  *Agreement Usually Committed to Writing*

The fourth *Winston* factor considers "whether the agreement at issue is the type of contract that is usually committed to writing."  777 F.2d at 80.  This factor does not merely evaluate whether settlement agreements are typically written.  Indeed, because "the *Winston* test is designed to determine

if a settlement agreement is binding absent a formally executed agreement, it would be a strange test if the fourth factor always favored finding no agreement on the ground that settlement agreements are usually written." *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, No. 04-CV-1621 (KMW)(AJP), 2005 WL 1377853, at *9 (S.D.N.Y. June 9, 2005). "Rather, courts evaluate complexity by considering (1) the amount of money at issue, (2) whether the terms of the agreement will carry into perpetuity, and (3) the length and complexity of the agreement itself." *In re Elysium Health-ChromaDex Litig.*, No. 17-CV-7394 (LJL), 2022 WL 1156181, at *8 (S.D.N.Y. Apr. 19, 2022) (cleaned up).

This factor "weighs heavily in favor of enforcement" because the parties' agreements were "committed to writing — in the form of the parties' emails." *HVN Clothing, Inc.*, 636 F. Supp. 3d at 456; *see also In re Elysium Health-ChromaDex Litig.*, 2022 WL 1156181, at *8-9 (finding that emailed settlement terms constituted a writing for purposes of the fourth *Winston* factor).

Even if there were no writing, I note that the agreements at issue do "not approach the length or complexity of those frequently considered to require a writing." *Est. of Brannon*, 2015 WL 13746664, at *6 (collecting cases); *see Scheinmann v. Dykstra*, No. 16-CV-5446 (AJP), 2017 WL 1422972, at *5 (S.D.N.Y. Apr. 21, 2017) ("The agreement is not complex. The parties agreed on a relatively small amount of money ($15,000)"); *Walker*, 2006 WL 1662702, at *9 (finding that there was "nothing complex about this agreement" where settlement was for "one lump-sum of $7,500.00"). The agreements between Plaintiff and Defendants are between four and seven pages long, resolve a single dispute, and only the settlement between Plaintiff and Kia involves any payment of money—one lump sum of a relatively small amount of money. Accordingly, this factor weighs in favor of enforcement.

Having analyzed the *Winston* factors with respect to Plaintiff and each Defendant, I conclude that under federal common law, Plaintiff and each Defendant intended to be bound by their respective settlement agreements.

### 3. <u>New York Law</u>

The enforcement of settlements under New York law is governed by New York Civil Practice Law and Rules ("CPLR") § 2104. This provision states that "[a]n agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered." CPLR § 2104.

Courts have held that emails from counsel demonstrating an agreement on all material terms of a settlement accompanied by counsel's name at the end of the email can satisfy the writing requirement of CPLR § 2104. *See, e.g.*, *Est. of Brannon*, 2015 WL 13746664, at *7 (collecting cases); *Jackson v. N.Y.C. Dept. of Educ.*, No. 10-CV-9193 (DLC), 2012 WL 1986593, at *4 (S.D.N.Y. June 4, 2012) ("Under New York law, an e-mail from counsel that contains counsel's name printed at its end constitutes a signed writing"). Moreover, the Appellate Division, First Department has held that "if an attorney hits 'send' with the intent of relaying a settlement offer or acceptance, and their email account is identified in some way as their own, then it is unnecessary for them to type their own signature." *Phila. Ins. Indemnity Co. v. Kendall*, 151 N.Y.S.3d 392, 397 (2021).

As detailed above, the emails submitted to the Court between Plaintiff's Counsel and counsel for Experian, Trans Union, and Kia described the material terms of the agreements. These counsels' names were identified in the "To" and "From" fields and appeared at the end of these emails. Thus, the emails satisfy the requirements of CPLR § 2104.

The record reflects communications between Plaintiff's Counsel and Equifax's counsel regarding the term that Equifax delete the Kia Account from Plaintiff's credit files, but it does not contain any email or any other writing demonstrating agreement to the other material terms of the settlement. However, as detailed, *supra* pp. 18-19, the other material terms agreed to by Plaintiff and Equifax—that Equifax make no payment to Plaintiff and mutual confidentiality—are clear. Thus,

because Plaintiff and Equifax agreed on the material terms of the settlement, the requirement of CPLR § 2104 is not applicable. *See Smith v. Lefrak Org., Inc.*, 531 N.Y.S.2d 305, 306 (1988) ("where there is no dispute between the parties as to the terms of the agreement, the courts will refuse to permit the use of this rule against a party who has been misled or deceived by the oral agreement to his detriment or who has relied upon it"); *Regolodo v. Neighborhood P'ship Hous. Dev. Fund Co., Inc.*, 906 N.Y.S.2d 775 (Sup. Ct. N.Y. Co. Nov. 3, 2009) (estopping defendant from raising "technical defect" of not complying with formal requirements of CPLR 2104 where "agreement and all its material terms were clear, final and definite").

Therefore, even under New York law, the settlement agreements should be enforced.

### B. Sherman and Ticchio's Authority to Enter Into Settlements on Plaintiff's Behalf

Having found that the parties intended to be bound by their respective settlement agreements, the Court turns to the question of whether Plaintiff's Counsel had authority to enter into those agreements.

Because Plaintiff invoked this Court's federal-question jurisdiction when he filed this lawsuit, the question of whether Plaintiff's Counsel had authority to enter into settlements on Plaintiff's behalf is governed by federal law. *See In re Artha*, 91 F.3d at 328; *Villar v. City of N.Y.*, 546 F. Supp. 3d 280, 286 (S.D.N.Y. 2021).

"Settlement agreements to end litigation are strongly favored by courts and are not lightly cast aside." *Collick v. U.S.*, 552 F. Supp. 2d 349, 352 (E.D.N.Y. 2008) (citing *Willgerodt on Behalf of Majority Peoples' Fund for 21st Century, Inc. v. Hohri*, 953 F. Supp. 557, 560 (S.D.N.Y. 1997)). However, "a settlement agreement is binding only if the attorney (the agent) had the client's (the principal's) actual or apparent authority to enter into the agreement." *Hillair Cap. Invs., LP v. Smith Sys. Transp., Inc.*, 640 Fed. App'x 49, 51 (2d Cir. 2016) (summary order). "Although it is the client who retains ultimate authority to accept or reject a settlement offer . . . the circumstances surrounding a settlement

agreement reached by an attorney may demonstrate that the attorney acted within his proper authority, such that the client is bound by the agreement." *Valez v. City of N.Y.*, No. 08-CV-3875 (DLC), 2009 WL 3170098, at *6 (S.D.N.Y. Oct. 1, 2009)

Federal courts "presume that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so." *In re Artha Mgmt.*, 91 F.3d at 329. "In accordance with that presumption, any party challenging an attorney's authority to settle the case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority." *Id.* "This burden of proof is 'not insubstantial.'" *Joseph v. Worldwide Flight Servs., Inc.*, 480 F. Supp. 2d 646, 653 (E.D.N.Y. 2007) (citing *U.S. v. Intl. Bhd. of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993)).

Actual authority stems from "direct manifestations from the principal to the agent." *Reiss v. Societe Centrale Du Groupe Des Assurs. Nationales*, 235 F.3d 738, 748 (2d Cir. 2000). "[A]n attorney's actual authority may be inferred from the words or conduct of a client which the client had reason to know would be regarded by the attorney as authorization to settle." *Valez*, 2009 WL 3170098, at *7; *see also Intl. Bhd. of Teamsters*, 986 F.2d at 20 (courts may infer actual authority "from words or conduct which the principal has reason to know indicates to the agent that [s]he is to do the act") (alteration in original). "[T]he Court must consider those statements and conduct from the client's perspective, rather than the attorney's." *Valez*, 2009 WL 3170098, at *8 (citing *In re Artha Mgmt.*, 91 F.3d at 329). Accordingly, the Court must determine "whether *Plaintiff had reason to know* that, from his words or conduct in his conversation with his counsel, his counsel would conclude that he had been given authority to settle" on certain terms. *Valez*, 2009 WL 3170098, at *7 (emphasis added).

Plaintiff argues that his Counsel had "authority 'to only to purpose' [sic] settlement offers to all four defendants," not "approval authority." (Opp. to Kia at 3 (ECF pagination).)

This assertion is belied by Plaintiff's own submissions, which indicate that Plaintiff's Counsel had actual authority from Plaintiff to enter into settlement agreements with Defendants. For example, in an email dated May 5, 2022, Ticchio memorialized an earlier phone call in which Plaintiff granted him authority to settle with Experian, Equifax, and Trans Union on various terms and requested Plaintiff's confirmation of that authority. (Ex. A to Opp. to Trans Union at 2 (ECF pagination).) Plaintiff agreed by responding, "Yes James you have authority to seek settlement with Transunion, Equifax and Experian only." (Ex. A to Opp. to Experian at 2 (ECF pagination).) Similarly, with respect to Kia, Ticchio memorialized another phone call in which Plaintiff granted him authority to settle with Kia on various terms. (Ex. B to Opp. to Kia at 2 (ECF pagination).) Ticchio stated, "Once you confirm this authority, I will bring it to Kia." (*Id.*) Plaintiff has not submitted communications indicating that he disagreed with that authority. Moreover, given the extensive communications and negotiations documented in the record, after which Counsel proceeded with the settlement with Kia without protest from Plaintiff, Plaintiff had reason to know that his counsel would consider that he had Plaintiff's authority to settle on those terms.

Plaintiff also appears to argue that his Counsel only had authority to *propose* "specific settlement terms," not accept them. He takes issue with his Counsel agreeing to settlements in which Defendants would delete the Kia Account from Plaintiff's credit reports entirely rather than report that the Kia Account was paid in full. (*See, e.g.*, Opp. to Trans Union at 3; Opp. to Equifax at 2-3 (ECF pagination).)

Plaintiff's contention is again contradicted by his own statements.

On September 1, 2022, Plaintiff emailed Ticchio and Sherman, stating that he requested that "[e]ither [Kia] report[s] the account as paid in full or wholly satisfied to the three credit bureaus OR they completely remove the account from all three credit bureaus and agree that this account will not show up by any vendor, under any code whatsoever." (Dkt. 91 (emphasis in original).) This statement

casts serious doubt on Plaintiff's current assertion that he never provided Counsel authority to settle on the term that the Kia Account be removed from Plaintiff's credit reports.

Plaintiff has failed to meet his burden of proving by affirmative evidence that his Counsel lacked authority to enter into the settlement agreements. His "afterthought or change of mind are not sufficient to justify rejecting" the settlements. *Watson v. City of N.Y.*, No. 11-CV-335 (CBA)(CLP), 2012 WL 6006066, at *4 (E.D.N.Y. Oct. 24, 2012), *R&R adopted*, 2012 WL 6005781 (E.D.N.Y. Dec. 3, 2012). Accordingly, I find that Sherman and Ticchio had actual authority to enter into the settlements with Defendants.[7]

Because I find that the parties intended to be bound by the settlement agreements, and that Plaintiff's Counsel had authority to enter into those agreements, I respectfully recommend that Defendants' Motions be granted and that the settlements be enforced.

## II.    Attorneys' Fees

### A.    *Trans Union's Fee Request*

Trans Union requests that Plaintiff pay its attorneys' fees incurred in enforcing its settlement agreement with Plaintiff. (Trans Union Mem. of Law at 9.) Trans Union claims that it is entitled to attorneys' fees because its settlement agreement with Plaintiff contains a clause stating that the parties would be able to "recover any and all reasonable attorneys' fees, costs and expenses incurred in enforcing any term" of the settlement agreement. (*Id.*)

The provision of the settlement agreement on which Trans Union relies states:

> The Parties agree that any prevailing Party may recover any and all reasonable attorneys' fees, costs, and expenses incurred in enforcing any term of this Agreement, for breach thereof, or incurred in defending such a claim, in addition to any other damages to which that Party may be entitled.

---

[7] "To create apparent authority, the principal must manifest to the third party that he or she consents to have the act done on his or her behalf by the person purporting to act for him or her." *Valez*, 2009 WL 3170098, at *6 (cleaned up). Because there is no indication that Plaintiff had any interaction with Defendants' counsel before or during settlement discussions, apparent authority is not applicable here.

(Trans Union Settlement Agreement ¶ 11.)   Here, Trans Union sought to enforce the settlement agreement itself rather than enforce the breach of any term of the agreement.   Thus, I do not find that this provision of the settlement agreement provides a basis to recover fees.   Accordingly, I respectfully recommend that the Court deny Trans Union's request for attorneys' fees.

### B.  Kia's Fee Request

Kia also requests that Plaintiff pay its attorneys' fees incurred in enforcing its settlement agreement with Plaintiff.  (Kia Mot. at 11-12 (ECF pagination).)   Kia asks this Court to award these fees by exercising its inherent power to sanction parties.  (*Id.*)

Federal courts have "inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Int'l Prods. Corp. v. Koons*, 325 F.2d 403, 408 (2d Cir. 1963) (internal quotation marks and citations omitted).   A court may impose sanctions and rely upon its inherent authority "where the conduct at issue is not covered by one of the other sanctioning provisions," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991), or "in situations similar or identical to those contemplated by [a] statute or rule." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998) (internal quotation marks and citations omitted).   "The Court of Appeals for the Second Circuit 'has always required a particularized showing of bad faith to justify the use of the court's inherent power." *Royal Indian Raj Intern. Corp. v. Domains by Proxy, Inc.*, No. 08-CV-3445 (JGK), 2011 WL 2946367, at *3 (S.D.N.Y. July 20, 2011) (citing *U.S. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991)).   "[I]nherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44.

In support of its position, Kia cites to various cases in which courts have exercised their inherent power to sanction parties with respect to motions for settlement enforcement.  (Kia Mot. at 11-12 (ECF pagination).)   However, these cases all contain facts far more indicative of bad faith than in the instant case. *See Palmer v. County of Nassau*, 977 F. Supp. 2d 161, 167 (E.D.N.Y. 2013) (noting

that defendants' counsel ignored requests to resolve the matter after settlement for one and one-half years); *Royal Indian*, 2011 WL 2946367, at *3 (noting, *inter alia*, that plaintiff brought the litigation to impose costs, burden and harassment on the defendant, and that, after agreeing to a settlement in open court, plaintiff refused to cooperate in the execution of a written settlement agreement); *Bilodeau v. Vlack*, No. 07-CV-1178 (JCH), 2010 WL 2232484, at *5-6 (D. Conn. Mar. 17, 2010) (plaintiff in sexual harassment case "abused the process by failing to notify her lawyer that she would not agree to release the defendant as he expected" and continued to encourage the criminal prosecution of the defendant).

Kia argues that Plaintiff acted in bad faith by "refusing to honor not just the settlement with [Kia], but the settlement with other defendants." (Kia Mot. at 12 (ECF pagination).) I do not find that challenging the enforceability of multiple similar settlement agreements, without more, constitutes bad faith on the part of Plaintiff. Indeed, "sanctions are a serious consequence that must be well-justified." *Eisner v. Enhanced Recovery Co., LLC*, 407 F. Supp. 3d 132, 140 (E.D.N.Y. 2019).

Accordingly, I respectfully recommend that Kia's request for attorneys' fees be denied.

## CONCLUSION

Based on the foregoing, I respectfully recommend that Defendants' motions for settlement enforcement be granted, and that the parties' respective settlement agreements—the Experian Settlement Agreement, the Equifax Settlement Agreement, the Trans Union Settlement Agreement, and the Kia Settlement Agreement—be enforced. Moreover, I respectfully recommend that Trans Union and Kia's motions for attorneys' fees be denied.

Any written objections to this Report and Recommendation must be filed within 14 days of service of this report. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation. *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

*Peggy Kuo*
PEGGY KUO
United States Magistrate Judge

Dated:  Brooklyn, New York
        March 28, 2024